Case for argument this morning is 14-1203 in Re Tam. We'll begin with Mr. Coleman, then followed by Mr. Owens. Thank you. May it please the Court. Section 2 of the Lanham Act is unconstitutional on its face because it discriminates against private speech based on viewpoint. That is its explicit purpose. And that conclusion is inescapable regardless of the doctrine or the standard of scrutiny applied because banning registration of disparaging trademarks is axiomatically viewpoint discrimination. Mr. Coleman, this provision has been in the Lanham Act for almost 70 years. The First Amendment goes back further, obviously. Similar language was in the Trademark Act of 1905. This has been a provision that hasn't been shallow and unused. It's been used continuously. Isn't there such a thing as stare decisis? The Lanham Act, Your Honor, has changed considerably and our First Amendment jurisprudence, especially with respect to commercial speech, has changed considerably. On both of those axes, there's considerable reason to revisit the question, which arguably... Are you treating this under a commercial speech now? Your Honor, we have submitted that it is a commercial speech issue because of the wealth of jurisprudence to the effect that trademarks are commercial speech. Why would we say that this is government speech? We're looking at a registry that's maintained by the government. We're looking at a trademark that's enforced by the federal government. It's got federal government written all over it. It seems to me that the public recognizes that the trademark has some sort of legality to it that's federally endowed. Why isn't this government speech? Your Honor, actually, we would respectfully submit that actually, quite to the contrary, this Court has made it very clear. Actually, DTAB made it clear, and this Court also said in all glory that the issuance of a trademark in no respect is meant as an imprimatur of the United States government, nor could it be. Trademarks are private speech. Trademarks are speech in commerce. The register of trademarks is nothing but a database, a collection of those marks that meet a very technical standard of identifying source of trademarks that meet certain... A trademark gives a business person a special distinct position in the marketplace. It makes the business person more competitive, does it not? Absolutely. That's why we're here today. But what it doesn't do is in any way implicate the government's endorsement of the message of that trademark. But it's published. It's published. Is the official gazette still published? It is published by the U.S. government. I think, Your Honor, actually, that it is not physically published anymore, but it is an online database. There are many online databases of the government. And the trademark office examines it, don't they? They examine it. Don't they require disclaimers and maybe other changes? With respect to the narrow questions of whether or not there's secondary meaning, whether there's a likelihood of confusion, but not with respect to the message imparted by the trademark. Every single trademark imparts a message. Trademarks impart messages with respect to a wide range of vices of which the United States government does not approve. Alcohol, tobacco, sexual practices, all sorts of moral issues, including organizations that have unsavory policies. Mr. Coleman, if the government were to decide that this registration alone would be a basis for exclusion under the First Amendment based on the message, the impropriety of the particular word used, how would that affect copyright registration? There's a lot of copyrighted stuff I don't like out there. Would copyright registration have to similarly suddenly be eligible for government regulation and no more porn, no more crucifixes in urinals, no more things that the central composite of the American public might find offensive or disparaging? As Your Honor points out, there's a wide range of highly offensive and disparaging material that is in the register of copyright that bears a Circle C just as a registered trademark, in my client's case, would bear a Circle R if it were allowed by the PTO. The public does not assume that the fact that a copyright notice bearing a Circle C is in any way endorsed by the United States government, notwithstanding that the government will aid in the enforcement of copyright. Isn't the copyright a forum for the expression of the arts and it's realized as such whereas the trademark goes to the very heart of the stability in the marketplace? Your Honor, I'm not sure I understand that copyright is meant to be a forum. Certainly the extent that there's a depository requirement in the Library of Congress for the registration of a copyright is I think widely understood as something far less than a forum, merely a technical requirement that is a prerequisite for registration and no more than that. It is a prerequisite for enforcement of a copyright in the federal courts and just as the registration of a trademark is a prerequisite for certain benefits attendant to trademark enforcement, but it doesn't speak at all to a government creation of a forum or a government endorsement of the message. You said that you believe that a trademark is not really an endorsement by the government of the speech. Does it have to rise to the level of an endorsement for the government to be able to say that it's at least entitled to distance itself from the language? Not under the First Amendment, Your Honor. Why would it be a subsidy? Well, Your Honor, why would it be a subsidy? Because the government is helping people collect money and in Davenport, in DeSera, the Supreme Court said that government assistance in collecting money is a subsidy. The government is very clear, may not attach an unconstitutional condition even where notwithstanding the de minimis nature of any subsidy. That's not answering my question. Is it a subsidy? No, Your Honor. Why not? Because the mere fact that government is involved in the administration of a legal regime does not make any aspect of that regime a subsidy. And that is the case here. Unlike in McGinley where prior to the trademark amendment of 1989, where the trademark registration system was largely funded directly from general revenues, it can be said, not in the most accurate accounting sense, that the system is now applicant funded. No one would even attempt to trace dollar for dollar what aspects of the trademark operation of the PTO system comes from application dollars. I'm not making that argument, I don't think it's possible to. But the cases are clear that it is necessary to. This would not qualify as a subsidy. It's merely part of what government does. And it's largely funded by applicants. And to the extent that government is engaged in the activity of registering trademarks, once it registers a trademark, examines and registers a trademark, maintenance on the registered trademark is essentially cost free for the government. Can I ask you a question? Mr. Tam and his band obviously have engaged in a very interesting and important debate about the use of certain words and whether you can reclaim previously disparaging words. And that's clearly very important to him. What would the denial of the trademark do to his political views? Is the band going to change their name because they can't trademark it? Or are they going to continue to use the S word as their name? Well, that frankly is a decision that they would have to face at that time. There's no question that their ability to make the most use of their name, notwithstanding what publicity might attend these proceedings, is prejudiced by the fact that they're not as able to... Sure. That's obvious. I mean, all of these conditions cases, there is some limitation on a group or organization's ability to do certain things if it accepts federal funds that have conditions on them. They're not going to fund what you're on. Well, I'm going to put that aside. I mean, assume that I think the benefit you get here is equivalent to federal funds. I know you disagree, but the purpose is this. The question then becomes, are those conditions so onerous that it would force Mr. Tam and his band to change their name? And it seems, given their very strong belief in this topic, unlikely. Well, Your Honor, I think it's an unfair question because first of all, Mr. Tam is not the right proxy for that question. The much more important question is the hundreds or thousands of millions of other trademark applicants who are not as well-spoken, not as assertive, not as fortunate to have pro bono counsel as Mr. Tam, who will not choose trademarks that they otherwise might choose, but will be chilled from doing so by virtue of Section 2A. But this isn't a ban on speech. I mean, that makes this very different from a full variety of personal information. But it is nonetheless a... It is a chilling of speech. It's not a ban on speech, but it is... But by virtue of withholding the full benefit available to any applicant under the trademark, under the Lanham Act, who otherwise would, under what the Lanham Act's criteria for registration are, would otherwise qualify for registration, he's being denied a benefit. Just as we say that... But isn't there a distinction between the fact that possibly certain benefits might flow versus certain negatives would flow from the use of speech? Well, we say, for example, that although a speaker at a rally may be denied police protection, he's still free to go into his backyard and have his speech. Nonetheless, the government may not deny a parade rally or police protection or a microphone to that speaker. He's free to still have his speech, but that speech is impaired. That speech is not of the same quality. And when that speech is being denied him, solely on the basis of the content of the message, of the precise nature of what it is he wishes to say, that is an impermissible viewpoint-based discrimination. How much, in your view, how much of 2A is unconstitutional? There's the disparagement provision, there's the scandalous immoral provision. Do they all stand or fall together? Well, of course, Your Honor knows that we have only been asked to address the issue of disparagement. Yeah, I'm asking you to address it. And we're not surprised that Your Honor would ask that question. It is hard to understand how the other provisions  But the constitutional jurisprudence with respect to those other terms are not necessarily the same. Why is it different? Well, I'm not necessarily in a position to defend the maintenance of the restriction of any of the other prongs of Section 2A. I'm certainly not going to... Does Section 2 also prevent precedents or flags or symbols and maybe they should all wait for a future case? I would think that they should. I'm not prepared to speak to that whatsoever. Those are broad content prohibitions. They're not in any way new trends. I don't mean the obscenity. But scandalous and immoral are close to disparagement as opposed to flags and... Yes, although interestingly, they're not viewpoint-specific. They are content-specific, and that is a somewhat different inquiry. And it is a different one. It is definitely a different one. But it is truly critical here that what is going on here is the viewpoint selection and not the topical selection. It's not merely a question of whether or not the choice by our client to make a comment about past ethnic slurs or present ethnic slurs in a choice of a band is being prohibited. It's the fact that it is perceived as an ongoing ethnic slur. It is a viewpoint that is being perceived as an ethnic slur. That is the viewpoint discrimination that is prohibited, and that is why Section 2A is unconstitutional. So your position is that no line whatsoever would be drawn no matter how much one might be shocked by the particular usage? That is the position of the United States Supreme Court, certainly in RAV. The Court made it very clear that hurt feelings, devastated feelings, broken hearts, that was a cross-burning case. It doesn't get much worse than that. That case didn't deal with the provision of government benefits. And again, I know you would disagree with that, but assume that this is a provision of government benefits. The Court also made very clear that when the government establishes programs that it can choose which messages to support and which not with government funds. Again, two different issues. Although RAV did not deal with the provision of government benefits, I would ask the Court to consider, first of all, Sorrell, which was not a government benefits case, but which did deal with the issue of commercial speech, which, again... What about the benefits? I'm sorry? What about benefits cases? What about... But it cannot be viewpoint-based. It cannot be viewpoint-based. Because in the abortion cases, the government consistently forbade a particular type of activity with respect to receiving funding in order to continue... When they said that, they said, you cannot promote abortion if you receive that federal funding. But that was in connection with government speech. In other words, that was in order to receive funding to participate in a program that involved government speech. This doesn't involve government speech. In order to participate in a government program that gives you better access to federal courts, you can only register trademarks that meet certain conditions. How is that distinguishable from USAID, Ross, the library case, and all of those cases? Because in this case, the specific activity is the speech. Those are not... Those were incidental... Here, the speech being... Here, the activity being regulated. That was a condition. It's hard to say that the regulation in the library case wasn't speech as well when it was the very condition they imposed was imposing filters on Internet journals at libraries that would regulate speech. But those libraries are government speech. This is private speech. But there's no burden on your privacy. You can go out and use this S-word anywhere you want. If you try to use it within the confines of the government registration program, however, you cannot, because it doesn't meet the conditions. Right, so as R.A. Lee teaches, when you say you can use the speech, you just can't use it under the confines of the program. What you're saying is you can use it, just not as well. You can go set up your soapbox in your backyard. You're being deprived of a benefit based on viewpoint, and that's impermissible, even if there's funding involved with an impermissible constitutional viewpoint restriction. Why should we just limit our view of the trademark program as viewpoint-oriented? Isn't it much more than that? Isn't the purpose of the trademark statute designed to have some sort of regulational measurement of behavior in the marketplace? Yes, but that behavior concerns only consumer confusion and the source of origin of goods and services. I'll just point out to the court that we have actually asked students... So, confusion, the confusion inquiry, would you say that's viewpoint-based? No. Why? Because as a trademark lawyer, we don't consider viewpoint in the analysis of secondary meaning. We consider it to be... We consider other criteria, not opinion, not appendages. Let's say a trademark, you want to limit it to a certain geographical location or to instill in the listener a certain sentiment as to the product, who you are, the product that you sell. That's not viewpoint-oriented? It is viewpoint-oriented in an entirely different sense. But it is viewpoint-oriented? Yes, in which case we would only section 2A at all. It would fall under the rubric of... Would you want to define the part of the statute that deals with confusion in the marketplace because that's viewpoint-oriented? Should we rule that unconstitutional as well? No. Because that is not constitutionally prohibited. Section 2A is, however, constitutionally prohibited, and I am requesting to reserve the rest of my time for rebuttal. Madam Chief, members of the Court, thank you for the opportunity to address you today. Judge Hughes, if I may, I'd like to turn to the question that you asked because I believe it's really at the heart of this case. How do we suss out what I think is a fairly complex set of cases about government benefits, government subsidies? And while I apologize for beginning my argument with a quote, I don't think I could make this clearer than the Supreme Court did in the Legal Services Court v. Velazquez case. That was a case that involved Title X funds, and it's essentially, I think, fair to say, an extension of Rust. In that case, Velazquez clearly describes Rust as government speech. The Title X funds were a government program designed to accomplish a particular thing, and in selecting grantees, it was fine that the restrictions on those grants included incidental restrictions on speech because the speech was itself the government's point of view. In Velazquez, the Court made it crystal clear that that's how it sees Rust in this line of cases, and the Court wrote, neither the latitude for government speech nor its rationale applies to subsidies for private speech in every instance. As we have pointed out, it does not follow that viewpoint-based restrictions are proper when the government does not itself speak or subsidize transmittal of a message it favors, but instead expends funds to encourage a diversity of views from private speakers. It then goes on to say that this, in Velazquez, the program actually wasn't for the purpose of encouraging diverse views, because I think that's in question with the trademark regime. And instead it said, even though this, as in Rosenberger, the purpose is not to encourage a diversity of views, the salient point is that like the program in Rosenberger, the LSC program was designed to facilitate private speech, not to promote a governmental message. That is the bright line that the Supreme Court has designed in these cases. Is this a government subsidy? Your Honor, we see it more as a benefit than a subsidy. I think the subsidy cases are more closely linked with direct tax breaks. So it would not be distinguishable from Davenport and USERRA. To be frank, Your Honor, I think it's distinguishable in several ways. The first is that respect with subsidies or government tax breaks. It's clear that the Court again and again discusses these as matters of grace. There is a scarcity involved. There is a particular program... There's no scarcity in Davenport and USERRA. It's just helping people collect money, which seems very similar to this case. That's right. It is the government speech that's being used. And again, just as in Rust, the government makes clear that these are government funds and the government has an interest in keeping them from being used for lobbying or partisan activity. And does Davenport or USERRA involve any message-based restrictions by the government? Absolutely not, Your Honor. They were totally open to these messages, right? And by the way, the Court is explicit about that in both of those cases as well as Regan. In Davenport itself, the Court notes, we do not believe that the voters of Washington impermissibly distorted the marketplace ideas when they placed a reasonable viewpoint neutral limitation on the use of tax funds. That's completely apples and oranges from what we have in the trademark regime. We have a specifically viewpoint-based mandate in the Lanham Act. It's viewpoint-based because you can't disparage what you can favor? That's correct, Your Honor. And in fact, in the RAB case, the Court provides that as a literal example of what viewpoint discrimination is, that where someone could say something laudatory about someone but could not say something disparaging. That's the actual example that the Supreme Court gives of an archetypal viewpoint discrimination. What if we were to conclude it's content-based and not viewpoint-based and then the government decided that it wanted to subsidize nondisparaging marks by giving applicants maybe a discount for its filing fee? Would that be permissible? I don't think so. And the reason is that content and viewpoint are labels. And what they're both trying to get at is the same idea, which is the government is never permitted to engage in anything with the purpose of suppressing particular private viewpoints. Folks stop. We're talking, I'm trying to bring in the spending power case now, where the government is allowed, as I understand it, to fund certain kinds of speech, to promote certain kinds of speech, to select through its programming a speech that it wants to endorse. And now what if the government were to pass a law that says, okay, for nondisparaging marks you can get a discount? I don't believe the government can do that when it is targeting private speech. The regulation of private viewpoints is never a permissible government's intent and no case suggests that. So let me ask you, can I interrupt for just a second, just because there's a problem with the clock. It was set at the inappropriate time and I don't want to confuse you, but we're down to six minutes. So just set the clock at six, please. Okay, thank you. You had 10 minutes. Of course. No problem. Sorry, Judge. No, that's fine. Can I just ask you a hypothetical? Of course. Suppose you were a small family planning organization and that you operated entirely on federal funds. You had no means of obtaining outside support and you provided birth control, you provided all kinds of family planning things and you also provided abortion-related counseling. The government comes along and says, we're not going to give you federal funds anymore if you continue to provide abortion-related counseling. And you're in the position of either continuing to express your First Amendment rights or accepting the funding condition and going forward. It seems to me from the Supreme Court cases that that's perfectly permissible, even though if their choice is go out of business or continue to operate, they're going to have their First Amendment rights chilled with respect to abortion counseling. Why is that any different here? Assuming, again, I know it's disputed, that the registration program is a government benefit. We believe it's a government benefit. And we do agree with Judge Moore's additional views in the original panel opinion here that the best viewpoint to look at, the best lens for this case is the unconstitutional conditions doctrine. The reason I read that section from Velazquez is because I really think that's where the meat of this case is. The court has drawn that line between funding its own voice, even when that's coercive, which I think answers your hypothetical, and funding private speakers. Where a program exists for the purpose of regulating private speech, the government may never have an interest in only facilitating the speech it likes. There's no case that indicates that. In Davenport v. Sarah, that was private speech, and it was held that the government could decide not to subsidize speech on election issues, or partisan political issues. And in both cases, the court was clear, number one, that it did nothing to distort the marketplace because it was a subsidy of grace, and number two, that viewpoint discrimination was not present in either. So what it said was content discrimination is okay, but viewpoint discrimination is not. So if we viewed this as content discrimination, it would be okay? Well, as I began to explain earlier, those are labels to get at what the big prohibition that looms beyond all this is. But they're labels that the Supreme Court has given us that we have to deal with. Well, that's true, Your Honor. However, there are some cases where it doesn't hang on that word. The basic rule, and this is a rule that you will not find a single case to disagree with, is that the government may not have, as a permissible goal, the suppression of private viewpoints. And if you were to find that this case was, quote, content-based, I don't believe that label would save you from the fact that we have a written record of the government saying, we don't like this viewpoint. We don't like the message that the slants are trying to get across. We Googled them. We figured out who they were. If they were somebody else, maybe it would be okay, but we know they're Asian, and therefore their viewpoint is impermissible. The court is, of course, within its power to label that as content-based, but I don't think it gets the court out of the problem of the actual record being crystal clear. It is undisputed that this was denied because of disagreement with the message. Perhaps that inquiry was taken not to establish the viewpoint that's being asserted, but rather to gauge the content when it fell within one of the categories of the trademark inquiry. And where those content distinctions are within the purpose of the trademark regime, and this is true under the unconstitutional conditions or the limited public forum doctrine, the rules are that the content distinctions are permissible so long as, number one, they are not aimed at particular viewpoints, and number two, they're relevant to the purpose of the program. How could we view this as the inquiry being aimed at behavior in the marketplace and not a particular viewpoint? Well, I'm not quite sure how that question changes it because it is still, what it is doing is saying the Trademark Act is intended to prevent confusion to consumers. Ironically, the way that the trademark now acts, that it only... Let's look at it. Maybe it's intended to provide some sort of order in the marketplace in order to ensure stability, economic stability for the country. Fair enough. So that's why you don't want to have fraud, deception, confusion. And all of those are totally permissible content. No public disparaging remarks and the effect that they may have on the stability of the marketplace. That's right. And all of those are totally permissible because they're not aimed at the government picking and choosing between which ideas it likes best. Not at all. They're completely agnostic as to what your actual political beliefs are. The problem is in looking at disparagement. Not only is it viewpoint-based, it's completely inconsistently applied. It barely even meets a rational basis. As we cited in our brief, there are numerous times that Madonna red wine has been granted and numerous times it's been denied. And even if the system worked, even if it wasn't a hopelessly vague and inadmissible standard to ask of government employees, even that, we then have the bizarre situation that the government, you all, now spend more time talking about the disparaging, immoral, and scandalous trademarks, more government funds, consumers have more confusion and less regulation precisely for the speech that the government says it wants to treat worse. So the system simply doesn't work. That brings us back a little bit to where Judge Laurie started, which is this has been around forever. There is a stare decisis element here. Are you saying that there's been a change in the way that at least the disparagement provisions have been interpreted over the years by the government? Not dissonantly from our view of the registration and denials, Your Honor, but I would say that the mere existence of a federal statute for history has no normative force. And of course, there are many old statutes that get struck down as unconstitutional all the time. What I very much, I do appreciate, is Judge Dyke's mention of stare decisis, or excuse me, Judge Laurie's mention of stare decisis. The McGinley case is really the only case, may I finish my answer to your question, Your Honor? The McGinley case is really the only case that really specifically made a constitutional holding here and it's been referred to repeatedly for the last few decades. That case is a one-sentence holding that literally says the government need not occupy its time in the speech with which it disagrees. That is simply a patently untrue statement about First Amendment law. It would mean that parade permits could be denied to the KKK, which we know under Skokie is simply untrue. It might mean that the fire department... Before you sit down, can I ask the same question to you, Justice McClellan? Yes. How far does your theory take us? Does it also mean that the scandalous and immoral provision in 2A is also unconstitutional? Yes, Your Honor, and you should embrace it because it would bring trademark closer in line to the copyright and, by the way, the patent regime. So regardless of whether or not you see copyright as fundamentally different, the patent regime, patent sex devices, and gambling devices, the government should not be in the moral or speech belief business. And by removing those sections from the Lanham Act, finally trademark can be liberated to the marketplace and consistent with the other intellectual property regime. I have one last question for you, if you don't mind. Is it your view that the central Hudson rubric that normally applies as more like what I'll call an intermediate level of scrutiny is not the appropriate scrutiny here and that maybe something more like Sorrell's suggestion of heightened scrutiny when you have viewpoint-based discrimination is the appropriate rubric? I think that strict scrutiny is always appropriate when we are talking about viewpoint discrimination across the board. But even if this court were to use a lower level of scrutiny, the commercial speech doctrine never flexes the government's viewpoint regulation that is not limited to truthful or non-truthful or misleading speech. And, in fact, in RAV, there is a slam-dunk sentence in that case where the Supreme Court says a state may not prohibit only commercial advertising that depicts men in a demeaning fashion. So, again, whether it's unconstitutional conditions, commercial speech, limited public forum doctrine, the rules all boil down to the same thing. The government should never be in the business of picking and choosing among private viewpoints. The Lanham Act mandates that and, as such, it's facially unconstitutional. Thank you. Thank you very much. Good morning, Judge Hanley. May it please the Court. The fundamental problem with the First Amendment argument against Section 2 of the Lanham Act is that, as it seems to be conceded this morning and was conceded in the brief, it does not restrict speech. Mr. Tan can go out, he can use his trademark in whatever fashion that he wants, regardless of the provision. Mr. Tinney, Johnson v. Texas held that it is unconstitutional to ban flag burning. You know that. Right. Supposing somebody wants to register, it's good to burn the U.S. flag. That's disparaging of a national symbol, isn't it? If the question is whether that would... The question is, can you refuse to register something that the Supreme Court has held is facially, constitutionally protected? Well, I'm not sure whether that trademark, if it were such a trademark, would be subject to registration either under 2A or for other reasons. If your question is a constitutional one, the distinction that we're drawing here, the primary distinction that we're drawing here is between the government placing restrictions on what people can say. If you tried to tell people that it was illegal to advocate burning the flag and that was a lawful activity, that would be a very different case from a circumstance in which the question is whether the government should, as part of its registration program that it uses as what has to be considered as a subsidy because if it's not a subsidy and it's not a benefit and it's not a restriction on speech... Is it a subsidy for the county of Fairfax to record property flats because people can sue based on them and collect money? I'm not sure that... I mean, it's certainly a government program. I'm not sure how the analogy to the cases would go given that there's no sort of clear First Amendment issue there. The question is, is that a government subsidy? If allowing someone to sue someone else because you've got a registered mark and they're infringing on it, is a subsidy, then why isn't a flat recorded? Well, it certainly isn't a restriction on free speech and so the basic point that we're making here, I mean, if the other side wants to resist that this is a subsidy and if they acknowledge that it's not a restriction on speech, then it's not clear what their First Amendment theory would be at all. Can I ask you, your argument about distinguishing this from a restriction and that making all the difference that would, would it not apply equally to copyright registration? The problem with the copyright, we think the copyright registration would be quite a different case for a number of reasons. It would not be a restriction, would it? It would not. It would simply deny the government's good offices to prevent anybody else from stealing the entire commercial value of a particular work. The Supreme Court's decision in Rust laid out a general principle that what the government is doing is facilitating or encouraging speech. Ordinarily, a First Amendment objection can't be validly raised to defeat that based on the government making choices. But the Supreme Court in Rust also acknowledges that that is not a universal rule and particularly in circumstances. I guess what I'm wondering is whether this idea that the world is divided between restrictions and non-restrictions and on the non-restriction side we're in broad government discretion land of Rust. It seems to me that if you take that right-line view and say, well, they can say what they want to say. It's not a restriction that you've in fact captured an ability of Congress to deny copyright registration and thereby allow, as I say, the stealing of the entire value of any copyrighted work because you can't go into court and get an injunction against the distribution of 100 million copies of your movie. The same logic would apply I think to saying the government is providing property on which you can engage in speech activity and therefore can limit your speech in a public forum. For that reason, the Supreme Court in Rust expressly addressed that issue and said, of course, there are some circumstances and the circumstances that it enumerated were circumstances in which the First Amendment interests were so heightened and the traditional role of the government was one that would be fundamentally incompatible with the ability to distinguish among speech in that matter and so the Supreme Court in Rust specifically talked about that and said, for example, it gave the example that I just gave of the government assistance being provided in the form of property and it gave the example of a university setting where the speech interest just sufficiently heightened but then the court went on to say, of course, the Rust case itself is not an example of this and the court said, well, it's possible that you could consider the relationship, you could argue by analogy that the relationship between a doctor and a patient which is what was at issue in Rust is in this sort of level of heightened First Amendment scrutiny and First Amendment interest. But then... I'm having trouble following your response to Judge Toronto so let me follow up. Are you saying it would be constitutional and not a First Amendment violation if Congress enacted a statute that said we're going to regulate copyright and not allow copyright registration to issue due to scandalous, immoral, or disparaging copyright as adjudicated by copyright? No, we are not taking that position. We are not taking that position. And the reason is as articulated in Rust, although Rust articulates a general principle that when the form of the government enactment is something that facilitates speech rather than restricting it, that the government has latitude and that First Amendment challenges will ordinarily fail in certain  in which there are heightened First Amendment interests and there's a traditional role of government that would be incompatible with that. And this is all for... Are you saying that the government's copyright regime facilitates speech but the government's trademark regime does not? Is that the distinction you're drawing? No, it is not. Can you please explain to me a little more clearly the distinction that you're drawing between trademark and copyright and why it wouldn't be okay for the government to adopt an identical restriction in the copyright regime? Well, the copyright... If you go to both, which the Supreme Court considered in Rust, both the history and the nature of the speech that's at issue, the copyright regime protects core, political, artistic speech and since the beginning of the Republic, your only remedy to avoid, as was alluded to earlier, complete theft of your intellectual property in the copyright realm since the first days of the Republic has been federal copyright law and it would, as your hypothetical suggests, be quite extraordinary for the government to come in and say, no, we are going to restrict copyright in that matter. Well, doesn't that suggest maybe that we have to ask whether this is entitled full First Amendment protection Mr. Tam's speech or whether it's commercial speech because if it's political speech, then your theory about the copyright law comes into play and the government ability to subsidize or not to subsidize to select is more limited. So, don't we really, under your own theory, have to decide whether this is fully protected or whether it's just commercial speech because there are two reasons we don't think so, Your Honor. One is that this is a facial challenge to the statute and... Let's consider it as an as-applied term. Well, if you're considering it as applied to Mr. Tam's speech, you would still be considering the statute as a whole and whether Congress impermissibly didn't carve it out for this limited area but to take the question more directly even in the context of Mr. Tam, the Rust decision went on and the speech that was at issue in Rust, it said, could plausibly be analogized to the types of speech as to which you would have this heightened scrutiny. It said, the doctor-patient relationship arguably, and this is from the text of Rust, the doctor-patient relationship arguably could be... I don't think you're really responding to my question. Given the way you distinguished copyright, don't we have to decide here whether this is fully protected speech or commercial speech? I apologize because I don't believe I got to what I think is the key point in Rust which is that the next thing they looked at was the nature of the effect of the government enactment at issue on the speech and they said, we don't have to decide, this is what they said in Rust, we don't have to decide whether, and this goes directly to your question, we don't have to decide whether the speech that's at issue here is analogous to the speech that we talked about in the previous sentences that I had been alluding to earlier because the level of intrusion on that speech and on that relationship in this case, this case being Rust, is limited and of course in that case what was happening was they were denying federal funds to people who wanted to advocate abortion and we would submit that that is much more significantly, that is a much more significant limitation than here where we're talking about denying a federal registration, you still have the right to vote. I'm just not following what you're saying. Why, why if this is fully protected speech doesn't it come under your theory about Congress? The speech in Rust was fully protected speech and the Supreme Court  that a limitation on the provision of government assistance   in that speech was constitutional provisions. I don't suggest that your copyright example comes out the other way and that under that case it would be a violation of the Constitution or you could restrict copyright to things which were non-disparaging. No, because the reason that the court has recognized and the Velazquez case came up earlier and that's an example. There are some circumstances in which the combination of the nature of the speech and the level of government interference with the ability to put forward a message. What we need to talk about here is Mr. Chan, what the trademark registration program is, is fundamentally different from what the copyright registration program is because Mr. Tam remains free to use his trademark. Other consumers do not have a right even if it is not other, I'm sorry, mind you. What you're saying, I don't quite follow either, but it seems to me that the distinction that could be made is that in copyright the government has these limitations. It's so coercive that it essentially compels speech or it doesn't, you know, it prevents you from doing speech whereas the trademark realm, although it takes away some benefits of federal registration, you still have access to the courts under another part of the Lanham Act, you have your state act and so it is not so coercive that the restriction is a burden on free speech. Is that? That's exactly right. And that's coming from the USAID case and other cases I think, but how do we define that line because I mean, it seems to me that those cases are key, the constitutional conditions cases but they're also very unclear between, at least in the USAID case it talks about conditions that are okay because they define the limits of the government program and ones that aren't because they seek to leverage speech outside the program. Copyright is a different animal, isn't it? Copyright is quite different. The government doesn't process the copyright. Copyright is created at the time of the creation of the subject matter and then it is simply deposited or not in the library's columns. There's no examination. Yeah, there's at least not an examination of the format issue here but to go back to the... Nobody can go to court to enforce their copyright unless they get a registration. Yes. They can speak as much as they want and their speech can be stolen. You have to give by your good graces a federal government issued piece of paper called a registration to allow the copyright owner to prevent 100 million copies being made by pirates. Right, and that is a distinction from the trademark scheme that's at issue in this case because you do not need... Why would your argument not justify? Don't sully the government with involvement in giving a legal protection not extend to allowing first the federal government and then every state government from denying trademark protection. To disparaging law. It's just that you got there first. That is you rely on the background of state law and even two separate questions but state law trademark protection in order to say well we the federal government don't have to lend our good offices. I'm not sure where the stopping point is unless it's the principle that when the sole basis for this government imposition somewhere between a ban and a denial of money is a wide range of things the government can do but where the sole basis is we want to diminish the amount of received bad messages not for any reason having to do with their function as brand identifiers but the constitutional rule is you the government may not act on that basis. I'm not sure if that were the constitutional rule how Rusty Sullivan would have come out the way that it did. The Supreme Court said in Velasquez that was government speech. I mean in Velasquez I mean you also have the Davenport case and the Esursa case which were other types of benefits that clearly weren't government speech. Not viewpoint based. We have issues with saying that this is viewpoint based but also if you look What's your issue? You say A is bad you say A is good one is okay because it's not disparaging the other is not okay because it is disparaging. But the government is not distinguishing between you know between sides of the debate between who is being disparaged it's not saying you can disparage this group and not that group which is what was You can say nice things about the same group that if you say bad things about it would be disparaging. What was going on in R.A.V. which is the case that was alluded to earlier is in R.A.V. the court was addressing a circumstance and it said of course you could prohibit racial epithets to proponents of all views that was the counter example the court gave but here what you're doing is you're saying if you are advancing bad or negative thoughts toward a particular race then that was regarded in R.A.V. as problematic but even but as we said in Rust it was clearly viewpoint it was clearly viewpoint based. I want to get to Judge Hughes's point about whether or not the government has the authority to leverage the ability to regulate speech that has nothing to do with the underlying program and here the underlying program has is only related to protecting consumers in the marketplace from misleading information from information related that could be deceptive misleading fraudulent why isn't this a classic case of a government just choosing to leverage that power to regulate the content of speech that's not the scope of the government program that Congress has defined Congress defined the program as facilitating the use of certain marks and defined criteria and in the USA case and in the Rust case the Supreme Court was clear about what it meant by the distinction between within the program and outside the program you're saying that the purpose of the trademark act is to facilitate the benefits commercial benefits to certain members of a commercial public and not to others not to certain members it's to facilitate the use of certain marks but to be clear about what the Supreme Court line drew because it was quite clear it's to discourage the use of certain marks well its methodology is to prevent others from using confusing marks it's to facilitate the use as a source identifier that's effective of certain marks but the government you couldn't choose to facilitate commercial marks it certainly can choose to prevent the use of certain commercial marks well I mean what it does is it if people use a certain type of mark and they register it then they can exclude others from using confusingly similar marks and you can characterize that how you want but the point I wanted to get from the Supreme Court cases from USAID and Rust the distinction that was drawn there was between conditions that are placed on the grantee on the one hand and conditions that are placed on the program on the other and they put the word grantee in italics and then they also said conditions that are placed on the recipient that would be leveraging outside the program or conditions that are placed on the subsidy itself that would be inside the program and here what we're talking about is not if you use a disparaging mark then you are ineligible as a person from receiving trademark registration that's not the statute we're looking at here the only issue is the precise mark for which you are seeking federal benefits that is the part of the program you get a certificate in the name of the United States with the mark printed on it that's what you're after that's what you're asking for and this is the program that we're talking about and that is not a circumstance Along the lines of those comments about the certificate are you suggesting that this is government speech I found your brief a little bit confusing you don't mention Walker and the government speech doesn't come up to about page 50 of 55 and I don't see you clearly articulating the view that you believe this is government speech and should be analyzed under the rubric the Supreme Court announced in Walker so can you clarify the government's position on that please? Sure it's critical to talk about what speech we're talking about we are not saying that Mr. Tam's use of a particular mark in the marketplace is government speech that's his speech the problem with his argument in that regard is that that speech is not being restricted now if he's saying that he has a first amendment right to have the government issue a certificate in the name of the United States I don't understand that to be the expressive message that he's talking about to the extent that that is what he's saying and to the extent that what he's trying to do is force the United States to affirmatively take actions that would help him then that piece of the case which I think is the smaller piece and that's why it doesn't come up until the end of our brief yes it is government speech when the government is saying here is your trademark. Government issuance just to be clear make sure I understand government issuance of a trademark the registration process constitutes government speech so I want to make sure I really understand this it's very clear. And let me just follow on that. Is every government act speech? Well that was where I was going to go next. You stole my punchline. The reason and this goes back to your earlier question about why although we think the principles in Walker are relevant why the direct discussion of it comes late in our brief we don't understand this case to be about Mr. Tam asserting that he has a First Amendment right to have the government issue particular certificates say particular things take particular acts. What he's saying is that the speech that is protected by the First Amendment that I'm talking about here is my going out into the world using this mark and sort of proclaiming whatever message I want to send. It's not entirely  What's the answer to Judge Moore's question? Is it government speech to issue a trademark registration or not? I think when the government yes when the government issues the registration that act is a governmental act and is an expressive act saying that this is a mark that's eligible under the criteria Congress has set out for registration. I don't I don't understand Mr. Tam to be saying that the First Amendment interest he's trying to vindicate is in getting the government to do that. So I don't think the government would be likewise free to prohibit corporations for example whether it be state or federal government from registering corporate names that it doesn't like. Correct? Under that rubric any government registration a medical doctor who wants to register his state medical license if the government doesn't like his name they can prevent his registration because if they find his name disparaging they can prevent his registration. What if his name happens to be Osama bin Laden? Are we not going to allow him to register as a medical doctor  like his name? The reason that That would be government speech under your logic. I don't see how you've drawn a line between any federal registration and any government registration program no matter what it is and this one if you're going to call this government speech and be allowed to regulate anything you don't like about it. Again in that circumstance I presume that the doctor's primary purpose would be to obtain whatever the benefits are of the relevant registration rather than to obtain a piece of paper and the contrast with Walker is one that helps us in this case. In Walker what was going on there was a license plate that somebody wanted to display on their vehicle. It would say Texas on it and then it would say Sons of Confederate Veterans or have the logo underneath it. And the issue in the case was can they display this license plate? Can this license plate be attached to their car and shown to the world? And the question in the case was therefore is that private speech, government speech or is it some of both? Is it your position that the government speech then is the register itself or maybe the use of the R with the circle around it? Or is it something else? It's certainly not, I think that that's probably an accurate description of what we're saying. It's not much, we're not saying that there's use of it. How is the C with the circle any different? Doesn't that bring us right back to the copyright world? How is the C with the circle any different from the R with the circle? There are several differences I can think of. One is that In terms of government speech. Well in terms of what's being said, what the government is expressing with that is much more limited. But fundamentally the problem with the copyright scheme that is being talked about is not the ability or inability to express something using the C with the circle. And that is what makes this case, we can see a difference from that. You said Mr. Ham's use of the federal, of a trademark with his name is not problematic and that's not the government speech. But what is in fact the government speech in response to Judge Stoll's question is the federal register. The R with the circle or the principal register which by the way I couldn't figure out where such a thing exists. It's not actually a book anymore and even the database on the PTO website doesn't call it the principal register. I'm not going to ask you to elaborate but I feel like it's a serial concept at this point more than an actual thing. So the point being your answer to Judge Stoll was yes, it is government speech when we're talking about registering it and putting the C with the circle side. I don't see how it doesn't convert the copyright into government speech at least when we're talking about registering it and putting the C with the circle. But the government speech argument doesn't get us to the point of validating if there were a restriction. Let's assume that there's no government speech here, that the registration act itself is not government speech, that it's some other kind of government program that doesn't involve speech. What does that do to your argument? It doesn't change it very much because our fundamental point is that the speech that Mr. Tam is arguing is being effective here is not restricted by this program. If there are government subsidies that don't take the form of the government actually expressing something like in Rust, like in Davenport, like in New Jersey. I just want to keep coming back to the denial of a copyright registration wouldn't restrict the copyright owner's speech either. That's what it denies is equal ability to legally protect that speech against private impairment. And that's why I cannot stand here and advocate a universal rule that if in every instance, if the government's actions only take the form of facilitating speech, is there any case in which the government, a government, has denied otherwise available legal protection for private speech against private impairment entirely on the ground that the government disapproves of that particular speech. The message received, let's for current purposes call that a viewpoint, is one that the government cannot discourage, disapprove of. I'm not aware of one. If you frame a question that specifically, I'm not aware of another provision. I meant that to be fairly broad. We are talking about a category of government action that is neither the grant of money nor the prohibition or restriction, but something in between that matters a lot. It seems to me the category is denial or conferral of otherwise available legal protection against private interference of a speech like denying police protection to a parade because we don't like that parade. Or denying copyright registration which doesn't do anything except deny the copyright owner the ability to go to court and stop private interference. Same thing here. And I'm not aware of an instance in which a court has said yes, the government may do that because we do not like the speech. Are you accepting the proposition that this is based on the government's dislike of the particular speech? It seems to me the way it operates is that it tries to make an objective assessment as to whether it's offensive to a substantial segment of the population, not whether the government likes the particular speech or dislikes the particular speech. No? That's right. And Congress has set criteria and it's helpful to just go back to what this program is really all about. It's a trademark program and Congress has set criteria. If Congress had said that there were certain types of marks that it wanted to encourage people to use and facilitate and if you wanted to use those types of marks the government would help you enforce them against other people and it could place restrictions and it's not because the government likes one kind or another kind but it would be surprising if you said the government just had some font restrictions or it had other... But those have nothing to do with traditional Supreme Court recognized concerns about impermissible bases for government decisions like we don't like this speech because it offends some part of our population. That's what's going on here, right? Wasn't the point of the Bill of Rights to protect unpopular minorities? I think both questions are getting at the same point and so if this were a government restriction then we would have great difficulty and the question as I understand it is really going to should this more fairly be analogized to cases in which the government is placing restrictions on speech or should it more fairly be analogized to cases in which the government is subsidizing or providing benefits? Let me just say again, I don't understand why you think the world can be divided up into two categories of restrictions and government subsidies. The government is doing a lot of different kinds of things that affect and are designed to affect speech that goes on in the world. The world is not divided in that binary way. The question is not is it more like this or more like this. It is this thing, what is the basis for the government action? The basis is we don't like this speech because it offends a part of our population and we disapprove of it and we would like there to be less of it so we will deny a legal protection. Why is that okay for the First Amendment? Well, even if you don't think that there are binary categories there are different ways that the government chose not to subsidize in a different way than what you described as denying legal protections. Why does it make a difference here as to whether this is fully protected political speech or whether it is just commercial speech? Does it make a difference or do you win or lose whole hog one way or the other? We think that our argument is made better by the fact that this case is about commercial speech. We don't conceive that if you consider Mr. Tan's speech to be political speech that we lose the case but to the extent that if you just take a step back and if you're taking a step back from doctrinal categories and just looking at what's going on here. Is this speech commercial speech or is it political speech? The use of a trademark we would submit and we understand Mr. Tan to agree is commercial speech. I'd like to go back to an earlier question that Judge Dyke asked you about whether or not this is the government's view of the message versus the substantial composite of the public view of the government. The government is entitled to disassociate itself from speech it finds odious. We should not have to quote facilitate the use of racial slurs. The public, the United States regards racial slurs as inappropriate. So is your position that the government is entitled to decide what it finds offensive and therefore exclude it? Well, exclude it in the sense of not having it be a part of a program that Congress has set up. The point I'm going, I'm sorry, you're focusing on excluding but what I'm trying  focus on is content. Is this about what the public might be offended by or what the government is offended by because the only way it's written in your entire section of government interest is that the government finds these things offensive. So I'm trying to understand the nature of your argument in terms of the restriction. The legitimate government interest the government has here. What is it? The test that's been applied and the way the USPTO understands the statute relates to the public's view of it and the government is the representative of the public and thus if the government is, the relevant question is whether this is disparaging to a substantial composite of the reference group, not the statutory test. The government looked at evidence of views of particular affected groups. That's correct. And the way we expressed it in our brief is implicit. The government  the representative of the public. Perhaps the distinction between the government concluding that people shouldn't do things that are disparaging to parts of the populace and because those people don't like it. We're not looking, when you look at language and culture,  looking at the effect that that has on the marketplace. For example, if you trademark a phrase, Mexico's not served here, what does that do to the marketplace? It creates an instability. The trademark regime is aimed at controlling or having some sort of effect on behavior in the marketplace, not necessarily on the effect that it has on certain members of the society. That point ties into the, just taking a step back and understanding what this scheme is about. This is not a scheme designed to help people to make political statements. It's not a scheme designed to prevent people from making political statements. It's not a  to help people make political statements. Congress made a determination that if people wanted to identify goods and services in commerce using particular identifying marks, that they should be able to do so, that they should get certain protections and that the government would establish a program whereby an expert federal agency would provide services that would assist people in enforcing those marks against others. That's really what the case is about, isn't it? Does this expert agency decide what's disparaging as opposed to the public, or who can always, if they think that this is disparaging, then you don't go to the concert as opposed to putting the government, I think we've circled all around what the real issue here is, but isn't the question whether in fact a government agency makes the decision as to what's disparaging? Well, Congress has determined, and the government agency doesn't decide for itself what it thinks is disparaging, as was referenced earlier, the agency relies on objective... But certainly what happened here, the agency decided this is disparaging, and therefore we're going to withhold these funds. The agency made that determination based on evidence in the record of the... That's right. The agency made that determination. I didn't make it up out of bubble cloth. They made that determination. Isn't that what we're talking about here, whether it's commercial or political or anything else? Where does the ultimate responsibility in the nation stand for the decision as to what is or is not acceptable to a certain group of people? The ultimate decision that the agency was making was not about what could or couldn't be said in the marketplace. The determination that... You just said that the agency considered evidence from those who were uncomfortable, felt disparaged by this particular mark, and there are others that have been brought to our attention. So where are you drawing the line as to where the role of the government in these social and societal issues of speech? If you look at the consequences of the agency's action, the consequences of the agency's action was that the U.S. Patent and Trademark Office would not take certain actions that would facilitate in some circumstances the enforcement of this mark. And when you're talking about the determination of... The agency's not taking the actions that facilitate the enforcement of the mark beyond the registration. The fact is that the law gives someone with the registration the right to bring certain actions, the right to have certain things deemed after a period of time to be incontestable. The agency's not jumping out there and fighting on behalf of these trademarks. I think you're overstating what the agency does. It just registers it. Well, what the agency does is issue a registration certificate and publish it. And most of the legal consequences that have been described in the briefing are flow from the fact that the agency has published it in a federal database and made it available to people and then other potential businesses get constructive notice based on that. Exactly like copyright. Exactly. There are legal benefits that flow. But the agency's not out there taking affirmative steps, spending affirmative agency money to defend these marks. And not very different from Fairfax County in its online publication of property law. The agency isn't out there litigating the cases in court. That's true. It's important to recognize if you're just talking about the scope of the agency's action and the scope of the benefits to compare that there are benefits. There is access to federal court if somebody has a confusingly similar mark to yours in the absence of federal registration. Registration is important. We're not saying it's not. And it's important to recognize that federal registration provides constructive notice nationwide. It provides a means to what the Supreme Court has called quiet title. That all flows from the fact that the U.S. Patent and Trademark Office has evaluated the mark, considered whether it meets the statutory criteria for registration and has determined that it does and has made that information public and then brings out people, anyone who wants to challenge it has to challenge it within a certain amount of time to raise certain kinds of objections. These all flow from what the U.S. federal government agency has done with respect to this mark. In that respect it is quite different from the copyright scheme. In the copyright scheme you would have no protection against theft of your work if it were not for the fact that it was registered with the copyright office. That is not true here. You're saying that the government can control the speech as long as you can have a little bit of protection but it can't control the speech if you have no protection. The protections are meaningfully different between those who are registered under  office and those who are not. I think the reason that the copyright issue seems like one that is so different from this one is that in that circumstance it seems impractical that there would still be a marketplace of ideas if people did not have the opportunity to prevent other people from making copies without compensation. The Supreme Court has recognized that if you have a circumstance in which the government is taking action and this is why it is an exception to the general principle articulated in Rust. Yes, there will be a more searching inquiry of the government's action than in circumstances like this case in which there is a commercial speech issue and there is a federal scheme that is designed to promote the identification of goods and commerce and Congress places reasonable limitations on that program. I was also wondering about the public forum doctrine. Your brief said that the Lanham Act did not create a forum for the expression of ideas. So I just want to understand the government doesn't believe that the public forum doctrine has any application in this instance? That's right. The government does not. You don't see the register of the forum. We do not see the register certainly as a public forum and we don't think that the expression of ideas, at least the ideas that Tam is concerned about are really being... How about the copyright regime? Is that a public forum? Well, it certainly... I'm not sure the register itself is a public forum. It certainly relates to speech that occurs out in the marketplace, a wide variety of speech. The notion that the same inquiry would have to apply to such a fundamental change in the way all speech is protected in the United States as would apply to a change in the difficulty that you will have in preventing someone from... When an author deposits a manuscript at the Library of Congress and walks away, is there somebody in there that takes it and looks at it and makes a determination whether that's going to be entitled to copyright or not? They do have to make a determination about whether it is copyrightable. It's a much less expensive determination than in the trademark context. Simply, if you walked in with a functional object, then the Copyright Office might determine that it's not. But the Copyright Office is not going in and, as in the trademark context, looking at the context of it and whether it effectively serves the purpose of the program at issuing copyright. It's a very different inquiry in that respect. Can I just... I'm going to have to follow up on one aspect of the forum question, the body of case law that involves, at least I personally find somewhat confusing, but there are various kinds of forums, non-public forums, public forums, designated forums. My understanding, and I guess I'm going to see if you can help me a little bit on this, is that all the forum cases involve the use of government property, actual government property, for speech. And that the register, and I don't hear you saying anything to the contrary, but that's going to be my question, is nothing but a list of people who have certain legal rights with respect to certain of their own property, not a piece of government property that is being used for speech and therefore forum doctrine in its variety of forms is not apt. Can you address that? I know you say it's not a public forum, but is it some other kind of forum or not a forum at all? Probably best described as not a forum at all. The only point of your question that I want to be specifically clear about is when you talk about the government use of, or use of government property, it has expanded to things other than sort of real property. Yes, mail systems, communication systems, broadcast systems that are hosting debates, but only some government property, and I have taken it that the whole point of this piece of First Amendment law was that when government property is involved, one needs to ask slightly different questions than in other kinds of things, but we don't have that. All we have is a list. We don't regard the register itself as a forum. I think that's probably the most straightforward answer to your question. Thank you, Your Honor. Your Honors, we think it's very clear that in fact copyright and trademark should be treated the same, and I think it's very important to note that the distinction that the government has tried to draw between the      on the register of trademarks fails to be treated the same. I think that the distinction that the government has tried to draw between the nature of copyright and  be treated the same. The court raised the hypothetical in the context of what if the same sort of restriction as exists in two ways were placed on the register of copyright. That would mean that there would be some sort of review. If there was some sort of review, then the message of acceptability of disparagement would also exist with respect to the trademark register. Furthermore, the suggestion that there's only a very slight that whereas there's no protection for copyright registered for unregistered works, but there's all sorts of protection for unregistered  you've got 43A of the Trademark Act is an exaggeration. Although one can, and frequently people do, bring federal actions to the register of copyright, for unregistered trademarks, the scope of protection is significantly  There's no customs interdiction for unregistered trademarks. There's no, none of the remedies available for counterfeiting, which the court gave as a hypothetical. One of the major activities in the field of trademark enforcement comes in the area of counterfeiting Counterfeiting where trouble damages are available, attorneys' fees, you need a registered trademark for that. So although it is technically true that there are state law remedies available for unregistered trademarks and there's 43A, it is not a quibble to say that there's a gigantic difference between a registered trademark and an unregistered trademark. And if the question is wouldn't the states be free to follow suit, not only refuse registration as all but about two do in state law, but wouldn't they be free to modify common law to refuse to offer protections to trademarks on a state basis? They certainly would be. They'd be following the lead of the federal government which they've already done adopting most of the land. They would be and in fact, Your Honor, by raising the issue of the states, there would also be the disadvantage which exists now, the difference between a 43A or a state common law enforcement of a trademark and enforcement of a registered trademark is that there would be  difference between a      registered trademark and a state common law enforcement of a registered trademark and a state common law enforcement of a registered trademark. Now, that's not a trademark, Your Honor. No, that's not a trademark. If it is likely to cause confusion, it is axiomatically not a trademark. The sine qua non of a trademark is that it is not likely to cause confusion with another trademark. What about fighting words or hate speech? Did Congress pass a law that prohibits the registration of fighting words or hate speech? Yes, because those are not protectable speech. Well, hate speech, Your Honor, that is a much more troublesome question. R.A.B. actually suggests that hate speech is a protectable form of speech. So, what is the First Amendment interest exactly? In the commercial speech area, if someone is solely promoting a product and service, to do it in a disparaging way with offensive racial connotations, what is lost if that is prevented? The loss is that the First Amendment will have no political speech. And that's so many of the cases that we've been talking about. But if it's just the promotion of the product or service, what is  that is served by allowing racially offensive references in that connection? Your Honor, R.A.B. teaches that when we speak about political debate, we're referring to the question of racism. Everyone in this room agrees, I hope, on the question of racism. We find it offensive. It is nonetheless a political debate whether or not racism is a bad thing. I'm asking just if you're trying to sell soap, what is the interest of allowing people to speak in a racially disparaging way? To vindicate the First Amendment, which prohibits viewpoint  in all events. It requires that all speech, regardless of how it senses, not be prohibited, filtered, gate-kept, restricted by the government in any way. Period. That's what Section 2A does. That is what Section 2A is meant to do by its very terms. If I understood the argument, the question, and the answer about the relation between possibly affirming a PTO and what states might do, the implication seemed to be, well, states would follow suit. Well, this stuff has been in the  a long time. There's nothing new about that. Well, but this actual, this question has never, Your Honor, I'm not necessarily interested in speculating. I was asked whether or not they might do it. The answer is they might do it. If this court had worked to affirmatively rule in a way that they arguably did not do in the Ginley, that not withstanding the fact that it sat on bank, considered this question at the level of depth that it has done so with the assistance of the government's participation at this level, and nonetheless decided that the Constitution permits the PTO as an agency. And I will comment, in fact, if I may, that the issue of whether or not a substantial cross-section of the affected population, you know, is found based on some level of evidence to have been offended versus whether or not the agency makes a determination is, of course, a valid one, but it's very clear from the government's brief. It's not just in the passage that was quoted by Judge Moore. It is clear from throughout the brief that the power we're referring to under Section 2A is one that the government considers itself to be the proprietor of. It is a government resource. The government should not have to employ its resources, permit the employment of its resources, allow its good name to be besmirched. It's all about the government, and that is what the Constitution prohibits. Why should we not view this as being all about the good name of  and the good name of society as a whole, but to maintain a stable marketplace that underpins the economic stability of the country? Your Honor, I couldn't agree more. It should do so. That is precisely why Section 2A is unnecessary. So what Congress has done here, they've set out factors that they believe are essential to maintain stability in the marketplace with respect to trademark. They created a trademark regime and said these are the factors and disbursement is one of those factors. Your Honor, I would submit respectfully that nothing in either the Lanham Act or Section 2A makes any reference whatsoever to stability in the marketplace. That's the entire purpose of the trademark regime, isn't it? No. The reason we don't want deception in the marketplace, we don't want confusion, we don't want trade practices or unfair commercial practices to ensue. So the trademark regime is designed to give a business person a competitive advantage in the marketplace, but not if it falls into these certain categories. Your Honor, I would submit that that argument proves too much. It almost becomes a rational basis argument. These specific... That's what I'm getting at. It is a rational basis argument. It's a compelling interest to ensure that the U.S. economy is stable. But under Central Hudson, we don't apply rational basis. We look at what the statute's purposes are based on how Congress expressed itself in passing the statute, and then we ask whether the restrictions that are being questioned have been narrowly tailored, and we submit that they have not been narrowly tailored. Moreover, Your Honor, I would submit that the marketplace itself, as was suggested by Judge Newman, are eminently capable of dealing with a social problem that the government is quite justifiably concerned about here. Why don't we trust the public to deal with deceptive practices then? Because Congress has made a judgment which does not impinge on the Constitution that that's an appropriate area for regulation. Thank you. Thank you. We thank all counsel and the cases submitted. That concludes our proceedings for this morning.